Filed 5/6/22  P. v. Tolano CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY STEVEN TOLANO,<br><br>    Defendant and Appellant. | B308213<br><br>(Los Angeles County<br>Super. Ct. No. VA145806) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Olivia Rosales, Judge.  Affirmed.

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

# I.   INTRODUCTION

A jury convicted defendant and appellant Anthony Tolano of first degree murder (Pen. Code, § 187, subd. (a)[1]) and possession of a firearm by a felon (§ 29800, subd. (a)(1)); it found true the allegation that defendant personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)).  The trial court sentenced defendant to 50 years to life in state prison.  On appeal, defendant challenges as unconstitutional three CALCRIM jury instructions that address post-offense conduct that might show an awareness of guilt.  We affirm.

# II.   BACKGROUND

## A.   *Prosecution Evidence*

A house on 56th Street in Maywood was a hangout for Maywood Locos gang members.  Defendant and Elias Jimenez were members of the Maywood Locos gang.

On the morning of June 14, 2017, Jimenez and his girlfriend went to the 56th Street house.  They were "between homes," and the house's owner gave Jimenez and his girlfriend permission to stay there for awhile.  When they arrived, defendant was on the porch and followed them into the house where he spoke with Jimenez.  Later, defendant spoke with Jimenez in the backyard, asking him about his expensive Jordan shoes and if they would fit defendant.

---

[1]   All statutory references are to the Penal Code unless otherwise indicated.

At some point that morning, Jimenez's girlfriend saw defendant and Jimenez in the living room. Defendant was showing Jimenez a small, semiautomatic handgun. Defendant loaded the gun's clip with hollow point and "regular" bullets.

Later that morning, Jimenez and his girlfriend went to the General Relief Office. When they returned, they walked past Pixley Park. Defendant was in the park with a woman and two children. He stared at Jimenez who was on the phone and did not see him.

That afternoon, Maywood Locos gang member A.M.[2] sat on a chair on the front porch of the 56th Street house and talked with "Belinda." He was waiting for defendant to return his bicycle.

At some point, A.M. saw defendant walking toward the house. Defendant was wearing black gloves, a white shirt, and shorts. A.M. asked about his bike, but defendant did not respond. Defendant walked past A.M. and into the house. A.M. remained outside, talking with Belinda.

About that time, Jimenez's girlfriend, who was in the bathroom, heard Jimenez say something like, "'What?'" followed by a pop that sounded like a gunshot. As the girlfriend was opening the bathroom door, she heard a second gunshot. When the door was open, she saw Jimenez on his knees; there was blood coming from his chest. The girlfriend turned and saw a hand and a small semiautomatic gun "in the doorway."

When A.M. heard the first gunshot he walked inside the house to see what had happened. He saw defendant holding a

---

[2] Jimenez's girlfriend testified that A.M. was a Maywood Locos gang member. A.M. testified that he was a former gang member.

handgun he believed to be semiautomatic. Defendant was aiming the gun down. Defendant then fired a second shot. A.M. ran outside.

Defendant came out of the house after A.M. and said to him, "'I love you, [A.M.'s gang moniker], I love you.'" A.M. did not see the gun and speculated that defendant had "put it in his waist." Defendant crossed the street to his waiting girlfriend and baby and they walked away.

A.M. went back inside the house and saw Jimenez on the floor. Within seconds Jimenez's girlfriend appeared and asked what had happened to Jimenez. A.M. said he did not know and ran home. He did not wait to speak with the police because he was afraid that he would have to testify.

Jimenez died from a gunshot wound to the chest. Two hollow point bullets were recovered during his autopsy.[3] Two expended cartridge cases were found near his body.

At about 10:09 p.m. the next day, Imperial County Sheriff's Office Deputy Pedro Velasquez stopped a vehicle with a defective headlight about 30 miles from the Mexican border. Defendant's mother was driving, his father was in the front passenger seat, and defendant was in the back passenger seat.

Defendant told Deputy Velasquez that they were going to visit family in Calexico. Defendant's mother consented to a search of the vehicle. Deputy Velasquez ordered defendant to get out of the car and attempted to pat him down. Defendant acted in a way that caused the deputy to fear that he might be reaching for a weapon.

---

[3] A third bullet from a prior shooting was also recovered during the autopsy.

Deputy Velasquez grabbed defendant's arm and put it behind his back. Defendant ran and threw a black object he had retrieved from an area on his waistband. Deputy Velasquez pursued and caught defendant. Deputy Velasquez asked defendant what he had thrown. Defendant responded, "[W]eed."

Deputy Velasquez searched the area where defendant had thrown the black object and found a gun. He also recovered a holster that was attached to defendant's belt. A Los Angeles County Sheriff's Department forensic identification specialist determined that two of the bullets recovered from Jimenez's body and the two cartridge cases found near his body were fired from the gun Deputy Velasquez found.

On August 9, 2017, Los Angeles County Sheriff's Department detectives interviewed A.M. Initially, he lied about being at the scene of the shooting and seeing defendant shoot someone, but eventually told the truth by the end of the interview. A.M. received no benefit in exchange for his testimony from the prosecution or the detectives other than the detectives' efforts to make sure that no Maywood Locos gang members were on the bus on which he traveled to and from court.[4]

A.M. also lied at the preliminary hearing when he testified that the detectives forced him "to say it was . . . defendant." At that time, he was out of custody and did not want Maywood Locos gang members to know he had identified defendant as Jimenez's killer.

According to A.M., he was "marked for death" for violating the main gang rule: no testifying against a fellow gang member.

---

[4] At the time of trial, A.M. was in Immigration Customs Enforcement custody, facing deportation based on a prior robbery conviction.

He was willing to testify at trial and tell the truth because he had known Jimenez's mother for a long time and it broke his heart to see her alone, without her son. He was risking his life so that Jimenez's mother received justice.

B.    *Defense Evidence*

B.H. and his mother lived across the street from the house on 56th Street in Maywood. On June 14, 2017, B.H. was in his bedroom when he heard a gunshot. He looked out the front door and saw a couple with a stroller.

B.H.'s mother heard gunshots and looked out her front door. She saw a couple with a baby stroller go by her house. The man was about 5' 9" tall and wore a white t-shirt and shorts.[5]

Defendant testified that he was not an official member of the Maywood Locos gang, but "claimed" the gang. He knew A.M. was a "tweaker"—someone who used drugs. A.M. was an acquaintance and not a friend. He was "somewhat" friends with Jimenez, whom he regarded as "the older homie." Defendant did not have a feud with Jimenez.

On the morning of June 14, 2017, defendant traveled from his home in San Bernardino to visit his grandparents in Huntington Park and friends in Maywood. His wife and children were not with him.

At about 7:00 a.m., defendant stopped by the 56th Street house "for like a brief second." Jimenez and his girlfriend arrived at the same time and defendant greeted Jimenez. Defendant spoke with Jimenez about his nice shoes and then left to go to his

---

[5]    In the prosecution's case, Deputy Velasquez testified that his report described defendant as six feet tall.

6

grandmother's house.  He never entered the house or the backyard and he did not shoot Jimenez.

Later that night, defendant received a text from J.F. an "O.G.," telling him that he needed to talk to him.  Defendant responded that he was at his grandmother's house in Huntington Park.  J.F. arrived there at 11:30 p.m., gave defendant the gun used in Jimenez's shooting, and ordered him to get rid of it.  Defendant did not know the gun had been used in a shooting, but suspected it was "hot."  He did not want the assignment, but he had no choice—"[t]hey tell you to do something, you got to do it."

When Deputy Velasquez stopped the car defendant's mother was driving in Imperial County, defendant was in possession of the gun used to shoot Jimenez.  Defendant ran and tossed the gun because he did not want to go to jail.  He never lied to Deputy Velasquez and did not intend to leave the country.  After he was arrested for possessing the gun, he was bailed out the next day and went to his mother's house in Victorville.  Had defendant intended to leave the country he could have done so then.

After defendant was arrested for Jimenez's shooting, a detective asked him when he was last in Maywood.  Defendant understood the question to concern when he last lived there and truthfully answered three years prior.  The interrogation was recorded, and the prosecution played the part of the recording that concerned when defendant was last in Maywood.

As reflected on the recording, the detective asked defendant if he was from Maywood.  Defendant responded that he was.  The detective asked, "But I don't think you live there anymore.  Its [sic] been awhile since you lived there?"  Defendant responded, "I haven't been in Maywood in like four years[,] sir."  Shortly

7

thereafter, the detective asked defendant, "Alright, so when's the last time you were in the city of Maywood then?"  Defendant responded, "Fuck . . . Like fucken three years ago."

## III.  DISCUSSION

Defendant contends the trial court erred when it instructed the jury with three jury instructions that address post-offense conduct that might show an awareness of guilt:  CALCRIM No. 362—Consciousness of Guilt:  False Statements[6], CALCRIM No. 371—Consciousness of Guilt:  Suppression and Fabrication of

---

[6]     The court instructed the jury with CALCRIM No. 362 as follows:

"If the defendant made . . . a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt.

"If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance.  However, evidence that the defendant made such a statement cannot prove guilt by itself."

Evidence[7], and CALCRIM No. 372—Defendant's Flight[8]. According to defendant, those instructions were "argumentative in favor of the prosecution, [they] allowed the jury to make irrational inferences, and [their] language presumed [his] guilt. Because the instruction[s were] slanted in favor of the prosecution, [they] reduced the prosecution's burden of proof in violation of [his] Fourteenth Amendment right to due process and proof beyond a reasonable doubt and his Sixth Amendment right to a jury verdict." (Fn. omitted.)

The Attorney General argues defendant has forfeited his challenges to these instructions because he did not object to them in the trial court. Assuming, without deciding, that defendant

---

[7] The court instructed the jury with CALCRIM No. 371 as follows:

"If the defendant . . . tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

[8] The court instructed the jury with CALCRIM No. 372 as follows:

"If the defendant fled or tried to flee immediately after the crime was committed or after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

9

has not forfeited his challenges (see § 1259[9]), any error in instructing the jury was harmless under either the *People v. Watson* (1956) 46 Cal.2d 818, 836 or *Chapman v. California* (1967) 386 U.S. 18, 24 standard for prejudice in light of the overwhelming evidence of defendant's guilt.

Jimenez's girlfriend testified that defendant was at the 56th Street house the morning of Jimenez's shooting. He had a small handgun that he showed Jimenez and loaded, in part, with hollow point bullets. She further testified that she saw the shooter's hand holding a small handgun. Jimenez was shot with hollow point bullets.

A.M., defendant's fellow Maywood Locos gang member, testified that he was on the front porch of the 56th Street house when he heard the first gunshot. He went inside where he saw defendant holding a handgun, aiming downward, and then firing. A.M. identified defendant as the shooter even though to do so violated the main gang rule of not testifying against fellow gang members and marked him for death.

Defendant admitted that he was at the 56th Street house the morning of Jimenez's shooting. He was found in possession of the firearm used to shoot Jimenez.

---

[9] Section 1259 provides, in relevant part, "The appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

                        KIM, J.

We concur:

RUBIN, P. J.

MOOR, J.

11